

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00337-CV

IN THE INTEREST OF R.S.O.C.,
T.L.-R.C., AND K.C.-D.E.,
CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant H.R. (Mother) appeals the termination of her parental rights to her children R.S.O.C. (Ryan), T.L.-R.C. (Tonya), and K.C.-D.E. (Kevin).[2]  We affirm.

---

[1]See Tex. R. App. P. 47.4.

[2]We use aliases for all of the children throughout this opinion.  See Tex. R. App. P. 9.8(b)(2).

## Background Facts

At the time of trial, Mother was twenty-seven years old. From age twelve to age twenty-one, Mother was in a relationship with R.C., the father of her two older children. Ryan was born in April 2000, while Mother was still in high school. Tonya was born in July 2001.

Mother began using marijuana when she was eighteen. She eventually increased her usage to daily. In 2002, Mother met K.E., and after a month, the two moved in together. In 2003, Mother's mother (Grandmother), who Mother frequently used for childcare, had a stroke. Grandmother's health deteriorated so that by August 2004 Grandmother could no longer work. Mother continued to drop the children off at Grandmother's, reasoning that Mother's brother, who lived in the same apartment complex as Grandmother, and his girlfriend could help watch the children.

At some point in 2004 or 2005, CPS received a referral for physical neglect regarding the state of Grandmother's apartment. The apartment was cluttered, dirty, smelled like urine, and one of the windows was broken. Also in 2004, Mother got into an argument with K.E. and was taken to John Peter Smith Hospital (JPS) for an evaluation. She was diagnosed with a mood disorder.

In May 2005, Mother began using cocaine. She used "big quantities" because the people she did drugs with used large amounts of cocaine. In June 2005, Mother returned to JPS for another psychiatric evaluation because someone alleged she cut her wrists. When Mother returned home from the

hospital, she found K.E. and another woman in her home. Mother "flipped out" and chased K.E. with a butcher's knife. The other woman jumped out a window. When the police arrived, K.E. told them that Mother was trying to harm herself. K.E. was arrested and charged with assault bodily injury of a family member. At some point after this incident, Mother and K.E. moved to separate residences.

In November 2005, Mother discovered that she was pregnant. Mother told K.E. that she wanted an abortion, and K.E. agreed to take her to her appointment. Instead, K.E. took Mother and the children to his house, where he kept them for three months. K.E. quit his job in order to constantly watch Mother. Mother and the children were scared, and they would hide in the closet. In February, Mother and K.E. argued so loudly that a neighbor called the police. K.E. told the police that Mother was "crazy," and Mother was again sent to JPS for an evaluation.

In April 2006, Mother was arrested on a theft by check charge from 2005. The next month, Mother started using cocaine again. On May 4, 2006, Mother allegedly shot at K.E. On May 15, 2006, K.E. tried to break into Mother's house with a gun.

In June 2006, Kevin was born. He tested positive for cocaine at birth. Mother admitted that she had been snorting cocaine when the contractions began the night before. CPS was notified and placed Kevin with Mother's aunt, Aunt E., in Louisiana. Mother voluntarily placed Ryan and Tonya with R.C.'s mother.

3

On December 23, 2006, Mother and K.E. got into an argument and Mother broke K.E.'s car windows with a brick. She was charged with criminal mischief and sentenced to thirty days in the Tarrant County Jail. In October 2007, Mother failed to show up to labor detail and was returned to jail for another thirty days. Mother committed another crime of criminal mischief in March 2008 by breaking the windows of K.E.'s house after another argument with K.E.; she was again sentenced to jail for fifteen days. Also in March 2008, Mother was charged with burglary of K.E.'s home. Mother denied that she was responsible, but she pleaded guilty and received deferred adjudication.

After Mother was released from jail after pleading guilty, she moved in with a woman, D.I. D.I. and Mother both used marijuana. In March 2009, Mother's probation was revoked for repeatedly failing drug tests. In April 2009, Mother went into the Substance Abuse Felony Program (SAFP), where she received counseling and attended a twelve-step program. In December 2009, Mother got out of SAFP and moved to a halfway house.

In January 2010, R.C.'s mother sent Ryan and Tonya to live with Aunt E. in Louisiana. R.C. and his fiancée talked to the children often, but they began to get concerned that the children had not been properly cared for. Ryan claimed that Aunt E. locked him in a closet, tied him to a chair, and hit his hands and feet with a hammer. R.C.'s fiancée testified that Aunt E. told them that if they tried to come take the children they would "get shot at." They contacted Louisiana CPS, but they did not receive any help.

4

In February 2010, all three children were dropped off at the Arlington CPS office by a relative. The children were dirty and had not eaten. Ryan had bruises, bite marks, "scattered . . . lesions," and an abrasion from an iron. One of his teeth was cracked. Tonya had bite marks, burns on her arm, and scratches and belt loop marks "over various areas of [her] body." Kevin had a cut on his head that had occurred several days prior and had not been treated. It required seven stitches. Ryan was admitted to a psychiatric hospital because he was banging his head on the bed and wall and saying that he did not want to live anymore.

Mother violated her probation in March or April 2010 by using drugs. Mother tried to run from the police for about two months, "basically jumping from house to house." She was finally arrested on April 18, 2010 and was sentenced to three years' imprisonment.

This case was originally set for trial in November 2010. Mother filed a motion for continuance and for an extension of the dismissal date because she was to be released from prison in November and stated that she "[would] be able to fully comply with the Service Plan." The motion was granted and trial was reset for April 2011. In November 2010, Mother was released from prison and put on parole. In December 2010, the trial court signed an "Order for Actions Necessary for Parent to Obtain Return of Child." Mother got a job at a grocery store in February 2011, submitted to a psychological evaluation, and participated in counseling.

5

On the day of trial, Mother again moved for a continuance, requesting additional time to complete her service plan. The motion was denied and the case proceeded to a bench trial.

The trial court found that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional wellbeing of the children, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional wellbeing of the children, (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the children, and (4) had been the cause of Kevin being born addicted to alcohol or a controlled substance.[3]

**Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.

---

[3]The trial court also terminated K.E.'s parental rights to Kevin. It did not terminate R.C.'s parental rights to Ryan or Tonya. Neither father is a party to this appeal.

Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*,

243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the

parent violated subsections (D), (E), (O), or (R) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## Discussion

### Grounds for removal

In Mother's first, second, third, and fifth issues, she challenges the legal and factual sufficiency of the evidence supporting the trial court's findings on the grounds for termination. The trial court terminated Mother's rights based on four grounds. In her statement of points, Mother challenged the legal and factual sufficiency of the evidence supporting the findings that she knowingly placed or knowingly allowed the children to remain in endangering conditions or surroundings, that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional wellbeing of the children, and that termination was in the best interest of the children. She did not challenge the findings that she failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of her children or that she had been the cause of a child being born addicted to alcohol or a controlled substance.

9

Former section 263.405(i) of the family code required the appellant to present to the trial court any issue she intended to appeal in a statement of points.[4] *See* Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 ("The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points on which the party intends to appeal or in a statement combined with a motion for new trial."), *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349. However, following our recent decision in *In re A.J.M.*, No. 02-11-00137-CV, (Tex. App.—Fort Worth July 16, 2012, no pet. h), we will review Mother's issues challenging all of the grounds for her termination.

Mother presents no argument to support her third issue challenging the trial court's finding that she was the cause of a child being born addicted to alcohol or a controlled substance. *See* Tex. Fam. Code. Ann. §§ 161.001(R), 261.001(8). She has thus waived this issue. *See* Tex. R. App. P. 38.1(i) (requiring an appellant's brief to contain clear and concise arguments "with appropriate citations to authorities"); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing).

---

[4]The final order of termination was signed on August 16, 2011. Because the order was signed before September 1, 2011, former section 263.405(i) controls this case. *See* Act of May 5, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that former section 263.405 is still in effect for final orders rendered before September 1, 2011).

Even if she had not waived this issue, there is sufficient evidence to support the trial court's finding that Mother was the cause of a child being born addicted to a controlled substance. Her own testimony at trial was that her labor was "cocaine-induced." She testified that she had purchased about eight grams of cocaine the day before she went into labor. She said, "About mid-way [through the eight grams], I started having contractions, and so I tried to make them stop. I sat in the tub, I stopped getting high, and the next morning, [Kevin] was born." Kevin's medical records were introduced at trial, and the CPS conservatorship worker also testified that Kevin tested positive at birth for cocaine. We thus overrule Mother's third issue as to all three children. *See In re G.E.*, No. 09-10-00188-CV, 2011 WL 193497, at *3 (Tex. App.—Beaumont Jan. 20, 2011, no pet.) (mem. op.) (upholding termination of mother's parental rights to her three children after "several" of them tested positive for drugs at birth); *In re J.L.*, No. 04-01-00767-CV, 2002 WL 31059854, at *2 (Tex. App.—San Antonio Sept. 18, 2002, no pet.) (not designated for publication) (noting that grounds for termination of mother's two children "were proved" by evidence that one of the children was born addicted to a controlled substance); *In re M.N.O.*, No. 09-02-00070-CV, 2002 WL 31835026, at *2 (Tex. App.—Beaumont Dec. 19, 2002, no pet.) (not designated for publication) (upholding termination of mother's parental rights to all three of her children on grounds that she was the cause of her youngest child being born addicted to cocaine). Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is

11

necessary to support a judgment of termination. S*ee In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Because we overruled Mother's third issue, we need not address Mother's first, second, and fifth issues. *See* Tex. R. App. P. 47.1.

**Best interest**

In Mother's fourth issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the children's best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

13

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just

one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**The evidence**

At the time of trial, Ryan was eleven years old, Tonya was nine, and Kevin was almost five. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Ryan had had a problem socializing in school for years. He had been hospitalized twice for psychological issues. After the children were dropped off at CPS, they would lie and steal and Kevin "played in his poop." CPS worker Davis testified that she had gone to the foster house to help deal with disciplinary issues with the children at least three times and spoken to them on the phone about their behavior at least twice.

Kevin had lived with Aunt E. since he left the hospital after his birth. *See id.* § 263.307(b)(2). He had never lived with Mother. Ryan and Tonya had spent almost half their lives out of Mother's care. After they were removed in 2006, they lived with R.C.'s mother for almost three years and then with Aunt E. for about a month. After they were returned to CPS in February 2010, Tonya and Kevin were placed in a foster home and Ryan was placed in a mental hospital for "several months." CPS tried to place all three children in the same home, but they fought with each other so violently and frequently that the foster mother asked CPS to take the children back. Ryan was sent back to the hospital and

15

then to another foster home, and Tonya and Kevin were placed back in their first foster home. Tonya and Kevin moved foster homes two more times. Shortly before trial began, all three children were moved to the same foster home.

CPS first became involved with Mother in 2004 or 2005 because of the state of Grandmother's apartment, where the children stayed while Mother worked. The apartment was dirty, smelled of urine, and had a broken window. Mother voluntarily placed the children in the care of others after Kevin's birth. She did not see them for about four years, even after learning that they were being abused or neglected by Aunt E. or learning that they had been deposited at CPS's office. *See id.* § 263.307(b)(4). Mother testified that Ryan had told her that Aunt E. was hurting him. Mother said that she believed Aunt E.'s discipline tactics "went too far," but she only spoke to Aunt E. once about it. When Mother and Aunt E. got into an argument over Aunt E.'s actions, Mother decided not to talk to Aunt E. anymore. Mother testified that she contacted CPS in Louisiana and they sent her a letter saying they would investigate.

Mother had been evaluated at JPS about four times. *See id.* § 263.307(b)(6). Mother also submitted to a psychological evaluation as ordered by the trial court. In her evaluation of February 24, 2011, the therapist noted that Mother "lack[ed] insight into her problematic thoughts and behaviors which [had] brought about her current life circumstances." He stated that Mother "maladaptively copes with stress and pressure via escape and rationalization" and that she enters into codependent and abusive relationships. He described a

16

"history of not learning from strong consequences" and noted that her "decision making and planning skills are faulty and lack consistency to promote self-growth." His prognosis for Mother was "guarded and will become poor if she does not fully participate in treatment services." His recommendations included medical and psychiatric evaluations for her depressive symptoms, participation in a domestic violence support group and a substance abuse support group, and a sponsor.

Ryan had been diagnosed with social concerns and a mood disorder. *See id.* § 263.307(b)(3), (6). At the hospital, he planned to take a blade from a pencil sharpener and cut himself with it. His psychological evaluation noted that he is impatient, physically overactive, gets distracted easily, and would leave class without permission. He is also violent, "spiteful or vindictive," and once brought a knife to school. He told the counselor that he thinks of himself as "crazy" and "stupid."

Mother testified to a history of abuse from K.E. *See id.* § 263.307(b)(7). She claimed that he started "putting his hands on [her]" while she was pregnant with Kevin. She also described an incident where she chased K.E. with a butcher's knife because she found him with another woman. Mother also pleaded guilty to a deadly conduct charge for a fight with K.E. in 2006 in which she allegedly had a gun. Mother denied having a gun, but she admitted to the fight and a criminal mischief charge. Also in 2006, Mother threw bricks through the windows of K.E.'s car because he did not give her money he had promised

17

for the children's Christmas gifts. In 2008, Mother broke the windows of K.E.'s house because he had gone to her house while she was sleeping and dragged her out of her bed by her hair.

K.E. had been arrested twice on assault charges. Mother testified that K.E. tried to break into her house, "banging on [her] door with a gun," while she was pregnant with Kevin. Mother testified that K.E. trapped her in his house, watching her twenty-four hours a day, for three months so that Mother could not get an abortion. Although she claimed she was no longer in a relationship with K.E., there is evidence that she remained in contact with him.

Mother began using illegal drugs when she was eighteen years old. *See id.* § 263.307(b)(8). She used cocaine and marijuana throughout her pregnancy with Kevin. She testified that she would buy eight grams of cocaine and use it within four days. Kevin tested positive for cocaine at birth and Mother admitted that she had been using cocaine when the contractions started. She also stated that while she was using the cocaine, Ryan and Tonya were sleeping. Mother had her probation revoked on March 5, 2009 because she had about thirteen failed drug tests in ten months. However, Mother had abstained from criminal conduct since her last release from prison and her drug tests had been negative.

After Kevin's birth in 2006, CPS offered Mother parenting classes, a drug and alcohol assessment, a psychological evaluation, and counseling, but Mother participated in none of the services. *See id.* § 263.307(b)(10). A CPS caseworker testified that Mother scheduled her psychological evaluation three

times and failed to show for each appointment. She initiated her drug and alcohol assessment but was discharged for noncompliance. She also continued to test positive for cocaine and marijuana. Mother testified that before her children were removed, she used cocaine recreationally, but after they were removed, she "started doing it every day[,] all day." Mother testified that she learned a lot from the twelve-step program she participated in as part of SAFP in 2009, but testified "when you don't use what you're taught, it doesn't matter."

Mother submitted to a psychological evaluation as ordered by the trial court and attended individual counseling. While in prison, Mother completed nine of twelve parenting classes. Mother testified that she also went to a six-hour anger management seminar while in prison. Mother secured employment at a grocery store. She had not completed a drug and alcohol assessment by the time of trial. Since moving out of the halfway house until the start of trial (a period of over four months), Mother went to four NA meetings. She testified that she had not yet found a sponsor or started to work the steps, although she acknowledged that it was critical to her staying off drugs. She said that she knows the steps "by heart, but as far as applying them to [her] life, [she does not]."

At trial, Mother testified that her cocaine habit "really didn't affect [her] ability" to care for her children. *See id.* § 263.307(b)(11). Mother admitted that she allowed K.E. to control her life and said she would not let someone do that to her again. When asked how she thought her lifestyle affected her children, she

said that she did not think they knew she was using drugs. In her psychological evaluation of February 24, 2011, she denied that her children had developmental needs or behavioral problems. *See id.* § 263.307(b)(12)(F).

Mother told her psychologist that she disciplined children by telling them to hold the arm of the couch and spanking them. *See id.* § 263.307(b)(12)(B). Mother would leave the children with Grandmother, despite knowing that Grandmother's health had deteriorated to the point that she could no longer work and had difficulty caring for the children. *See id.* § 263.307(b)(12)(C), (D). Mother claimed that her brother and his girlfriend would care for Grandmother and the children, but she also admitted that there were many times that they were not around and Grandmother was the sole caregiver. Mother denied that Grandmother's apartment was endangering, but she admitted that it was cluttered, the carpet was filthy, and that it smelled like urine.

Mother's psychological evaluation noted that she lacked a positive support network. *See id.* § 263.307(b)(13). R.C.'s fiancée testified that she believed that Mother was in a position to take care of the children. But she also testified that Mother did not have a place to live where she could take the children. CPS worker Gale Davis testified that at the beginning of trial, Mother had not yet obtained suitable housing for the children. *See id.* § 263.307(b)(12)(D). Mother did get a two-bedroom townhome in the middle of trial.

CPS worker Davis testified that the children, especially Kevin, were very stand-offish when they first started their visits with Mother. *See Holley*, 544

20

S.W.2d at 371–72 (looking at the desires of the child). Although Kevin had started to engage with Mother, Davis testified that he was disengaged again by the end of the visit. Davis reported that Tonya had been acting out sexually with the other children in her foster home. *See id*. (looking at the emotional and physical needs of the child). Ryan had also had severe psychological problems, requiring two hospitalizations. Davis testified that the children were not very respectful of authority and described having a number of disciplinary issues with them. Tonya's father R.C. testified that Tonya used to pee on herself, and he acknowledged that she could be aggressive.

When the children were left at the CPS office in February 2010, Davis contacted Mother and told her the children had been "obviously neglected." Mother was running from the police at the time and told Davis that she did not know what she was going to do about the children and that she would call Davis back. *See id*. (looking at the parental abilities of the person seeking custody). Mother did not call back until December 2010. Davis testified that because the children were voluntarily placed with Aunt E., Mother could have requested the children's return, but she never did. Davis said that she believed that by letting the children stay with Aunt E. after it was clear there was abuse or neglect, Mother allowed the children to stay in dangerous conditions.

Mother testified that while her children were in Louisiana, she sent them money, pictures, toys, and Christmas presents. She said she wrote them three times a week and called them on Sundays. When the children came into CPS's

21

care in February 2010, Mother did not go see them because she was hiding from the police.

Mother testified that she would be able to get insurance for the children through her employer and that she would be able to apply for food stamps. *See id*. (looking at the programs available to assist the person seeking custody). Mother said she had looked into daycare and that her sister-in-law was willing to provide backup daycare. Mother also testified that her sister-in-law was legally blind and had her niece and aunt assist her with "[b]asically everything." Davis testified that Mother could be able to receive free child care and counseling for her and her family.

Mother testified that Davis told her that Kevin was going to be adopted and that Ryan would be institutionalized and medicated because of his behavior problems. *See id*. (looking at the agency's plans for the child). However, Davis testified that the children's current foster home is dual-licensed and a possible adoptive placement for the children. Davis testified that the current foster mother is doing well with the children but that the children were still adjusting to the home and being around other children. R.C.'s mother (Ryan and Tonya's grandmother) called CPS asking to have the children placed with her. Mother told CPS that was not an option because Mother believed that R.C.'s mother "tried to set her up and accuse her of kidnapping the children before the children

were actually taken to Louisiana." R.C. and his fiancée also testified that they were willing to take the children.[5]

During trial, Mother got a townhome, signed up for family violence classes, and made an appointment for a psychological evaluation.[6] However, Mother had four months prior to the beginning of trial to complete these tasks and she did not do it. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Mother testified at trial that she would need another "couple of months" to be in a position to adequately provide for the children.

**Analysis**

Davis testified that CPS believed it was in the children's best interest to terminate Mother's parental rights. At trial, Mother did not appear to realize the effects of her drug addiction on her children or express any remorse for putting them through all the difficulties they had experienced in their short lives. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (noting that the parents' "poor judgment [and] the constancy of their drug use" weighed

---

[5]R.C. is not Kevin's father, and the State noted at trial that there was no pleading on file in which R.C. requested custody of Kevin. R.C.'s fiancée testified that their first home study did not meet CPS's requirements for Kevin.

[6]The trial began on April 25, 2011 but after the day's testimony, it was recessed until May 18, 2011, and then again until June 2, 2011.

23

in favor of terminating their parental rights).  While she insisted that she was drug-free at the time of trial and that she regretted using drugs while she was pregnant, she had relapsed in the past, had no sponsor, and was not working her twelve-step program.  Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."  *In re J.O.A*., 283 S.W.3d 336, 346 (Tex. 2009).  At trial, Mother claimed that her heavy cocaine intake "really didn't affect [her] ability" to care for her children.  The trial court was free to believe that Mother had not made sufficient progress in handling her drug addiction to indicate that she would be able to stay clean.

Mother had been jailed four times since her oldest child was born.  *See In re J.B.W.,* 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case).  She had been convicted of criminal mischief, theft by check, and burglary of a habitation.  *See R.R.,* 294 S.W.3d at 235 (considering evidence of a father's past convictions supportive of the trial court's best interest finding).  In between incarcerations, Mother was capable of visiting her children in Louisiana, even retrieving Ryan and Tonya, but she never did.[7]  Ryan told Mother of the abuse and neglect the children were suffering at the hands of Aunt E., but Mother let them remain with

---

[7]Mother testified that she thought she could not have possession of Ryan and Tonya while her CPS case was still open.

24

her. She could not take her children when they were returned to CPS because she was evading the police. During trial, Mother testified that she would still not be prepared to adequately provide for the children for another few months.

Although Mother attended an anger management seminar, she expressed no remorse for the violent fights in which she had participated in the past. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"); *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that the father's incarceration and pattern of criminal and violent conduct made it likely that he would face incarceration again in the future). When asked what she would have done differently in her life, she stated only that she had learned that she should not let other people influence her decision-making or control her behavior.

Ryan had a number of psychological issues that required treatment, and Tonya had acted out inappropriately, violently and sexually. Yet Mother denied to the psychologist that any of her children had problems. Kevin, who had never lived with Mother, had recently shown signs of attachment, but he still disengaged with Mother by the end of her visitation. At the time of trial, the children were in a foster home with foster parents who were addressing the children's issues. Davis testified that the foster home was a possible permanent adoptive placement.

25

Based on the evidence presented at trial and considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, the court could have reasonably formed a firm conviction or belief that termination of Mother's parental rights was in the children's best interest. We overrule Mother's fourth issue.

## Conclusion

Having overruled Mother's dispositive issues, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL, JJ.

DELIVERED: July 19, 2012